Christopher Berry (CA Bar No. 283987)
  cberry@aldf.org
ANIMAL LEGAL DEFENSE FUND
525 E. Cotati Ave.
Cotati, CA 94931
707.795.2533 ext. 1041 / 707.795.7280 (fax)

William S. Eubanks II (*pro hac vice* pending)
  beubanks@meyerglitz.com
MEYER GLITZENSTEIN & EUBANKS LLP
2601 S. Lemay Ave., Unit 7-240
Fort Collins, CO 80525
970.703.6060 / 202.588.5049 (fax)

Katherine A. Meyer (*pro hac vice* pending)
  kmeyer@meyerglitz.com
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave. NW, Suite 210
Washington, DC 20016
Fort Collins, CO 80525
202.588.5206 / 202.588.5049 (fax)

*Attorneys for Plaintiffs Animal Legal Defense Fund,*
*American Wild Horse Campaign, and Carla Bowers*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND; AMERICAN WILD HORSE CAMPAIGN; and CARLA BOWERS | Case No. 3:18-cv-06410 |
| Plaintiffs, | Assigned to: |
| v. | Referred to: |
| VICKI CHRISTIANSEN, in her official capacity as Chief of the United States Forest Service; GEORGE "SONNY" PERDUE, in his official capacity as Secretary of the United States Department of Agriculture; RANDY MOORE, in his official capacity as Regional Forester for the Pacific Southwest Region; and AMANDA MCADAMS, in her official capacity as Forest Supervisor of the Modoc National Forest | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Administrative Procedure Act Case |
| Defendants. | |

## PRELIMINARY STATEMENT

1.      This case challenges a recent decision by the United States Forest Service ("Forest Service") to sell federally-protected wild horses "without limitation," which the agency and its staff have acknowledged means that such horses will be sold to buyers who will send the horses to slaughter, likely for purposes of human consumption. These wild horses will be removed from the Devil's Garden Wild Horse Territory ("WHT") located in the Modoc National Forest in northern California.

2.      Neither the Forest Service, nor its sister agency the Bureau of Land Management ("BLM"), which also manages federally-protected wild horses, has previously adopted a policy allowing excess wild horses to be sold to buyers "without limitation," and thus with knowledge that horses will be slaughtered for human consumption. In fact, the longstanding policy and practice of both agencies after removing excess wild horses from the public range has been to either place horses for adoption or sell them "*with* limitations" to ensure that they are *not* sold for slaughter. Despite this longstanding policy and practice, the Forest Service announced this major reversal of position concerning the disposition of federally-protected wild horses through agency press releases and emails, and never subjected this drastic shift in approach to notice-and-comment procedures under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-706; nor conducted any analysis of this action or feasible alternatives to it under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h; nor prepared an environmental impact statement ("EIS") under NEPA for this precedent-setting action that is likely to violate California state law (California Penal Code section 598c) and the National Forest Management Act ("NFMA"), 16, U.S.C. §§ 1600-1687. Nor did the Forest Service supply any legally coherent, non-arbitrary explanation for its sharp reversal in longstanding agency policy and practice in implementing the Wild Free-Roaming Horses and Burros Act of 1971 ("Wild Horse Act"), 16 U.S.C. §§ 1331-1340.

3.      For all of these reasons, the Forest Service's decision to sell wild horses "without limitation" must be "set aside" and remanded to the agency as an action that is "arbitrary,

1   capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without

2   observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

3                                          **JURISDICTION AND VENUE**

4          4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal

5   question) and 5 U.S.C. § 702 (APA).

6          5.      Venue is proper under 28 U.S.C. § 1391(e) because Plaintiff Animal Legal

7   Defense Fund's ("ALDF") principal place of business is in the Northern District of California.

8                                          **INTRADISTRICT ASSIGMENT**

9          6.      Pursuant to Civil Local Rules 3-5(b), 3-2(c), and 3-2(d), this action is properly

10  assigned to the San Francisco Division of this Court because Plaintiff ALDF resides in and

11  maintains offices in Sonoma County.

12                                                  **PARTIES**

13  **PLAINTIFFS**

14         7.      Plaintiff AMERICAN WILD HORSE CAMPAIGN ("AWHC") is a national

15  nonprofit organization dedicated to protecting and preserving wild horses. Its mission is

16  endorsed by a broad-based coalition of public interest groups, environmentalists, humane

17  organizations, and historical societies representing over ten million supporters. A major focus of

18  AWHC's mission is to ensure that wild horses that are removed from public lands are never

19  allowed to be sold for slaughter. AWHC has been working on this effort for more than 14 years.

20  As part of that effort, AWHC has engaged in grassroots organizing, public education, legislative

21  and regulatory lobbying, and other advocacy to ensure that any wild horses removed from the

22  public lands are never allowed to be sold for slaughter.

23         8.      As part of its overall wild horse advocacy, AWHC is extremely familiar with the

24  Forest Service's wild horse management actions in the Devil's Garden Wild Horse Territory,

25  and for several years has been actively involved in efforts to protect and preserve these specific

26  horses.

27         9.      To date, AWHC has been successful in its efforts to make sure that no wild horses

28  removed from the public lands, including the Devil's Garden horses, may be sold for slaughter.

-2-

As part of those efforts, AWHC has conducted polling showing that 80 percent of Americans oppose the slaughter of federally-protected wild horses and burros, and has been successful in convincing Congress to maintain annual Congressional appropriations language that prohibits BLM from allowing the sale or transfer for slaughter of wild horses removed from the public lands. AWHC has also worked to ensure that the Forest Service continues to abide by this same prohibition with respect to the wild horses under its jurisdiction, including the Devil's Garden horses. Specifically with regard to the Devil's Garden wild horses, AWHC has participated in placement committees to ensure that any wild horses removed from Devil's Garden are not sold for slaughter, and has met with the Forest Service to plan a pilot fertility control program for the Devil's Garden wild horses, with a goal of reducing population growth rates and reducing the number of horses that will be removed from the public lands in the area.

10.     The Forest Service's recent decision to suddenly allow the sale of wild horses removed from the Devil's Garden WHT "without limitation"—meaning that they will likely be sold for slaughter and human consumption—frustrates AWHC's ability to carry out one of its core missions to protect these wild horses. This decision also undermines AWHC's overall mission to protect all wild horses from such a fate, and sets a precedent that dilutes AWHC's ability to ensure that no wild horses may ever be sold for slaughter. As a result of the Forest Service's decision, AWHC has had to—and will continue to have to—spend additional resources opposing this terrible practice with respect to the Devil's Garden horses and all wild horses. AWHC has already had to spend considerable resources on this advocacy, including conducting emergency public alerts and education on the matter, pursuing media opportunities to further educate the public and lawmakers about this drastic turn of events, initiating an organizing campaign around this issue, writing letters to appropriate government officials, and retaining legislative consultants to work at the state and federal levels to stop the Forest Service from carrying out this new practice. Accordingly, the Forest Service's decision has not only greatly impeded and frustrated AWHC's mission to protect the Devil's Garden horses and all wild horses from being sold for slaughter, but it has caused an immediate and continuing drain on AWHC's very limited resources that could otherwise be used for AWHC's other advocacy

on wild horse issues, including preserving viable free-roaming herds of wild horses on public lands throughout the West for future generations, and helping to devise and implement alternative approaches to reducing the population of wild horses in the Devil's Garden WHT.

11.     This impairment of AWHC's mission and the concomitant drain on AWHC's resources is directly caused by the Forest Service's new decision to allow the sale of wild horses removed from the Devil's Garden WHT "without limitation." AWHC has also been denied the opportunity to comment on this new approach and to submit information to the Forest Service to convince it not to proceed in this manner. All of these injuries will be redressed if AWHC prevails in this action because it will mean that the Forest Service will revert to its prior practice of *not* allowing the sale of wild horses for slaughter.

12.     Plaintiff ALDF's mission is to protect the lives and advance the interests of animals through the legal system. ALDF is a national nonprofit organization that has spent more than three decades advocating for the protection of animals through public communications, education, litigation, and legislation. ALDF's advocacy includes the protection of wild horses on public lands, and in particular, advocating that no wild horses removed from public lands be sold for slaughter. ALDF also advocates against slaughter of domesticated horses. ALDF's investment in wild horse and horse slaughter issues include public education, member outreach, government advocacy, and litigation. ALDF's efforts to end the suffering and unnecessary killing of animals are supported by hundreds of dedicated attorneys and more than 200,000 members and supporters.

13.     ALDF is extremely familiar with the Forest Service's management of the wild horses in the Devil's Garden WHT and has spent considerable resources in efforts to protect these horses. The Forest Service's recent decision to allow some of these horses that have been removed from the WHT to now be sold "without limitation" severely impairs ADLF's efforts to protect these horses, and to protect wild horses from being sold for slaughter. ALDF has already spent resources opposing this practice, and will continue to have to spend resources on such efforts. Specifically, ALDF attorneys have reviewed and signed a letter to the California Attorney General asking for enforcement of a state cruelty law against Forest Service's decision

to sell wild horses "without limitation." In addition, ALDF has fielded several inquiries from the public and media about the Forest Service's decision, which caused ALDF staff to divert resources to further investigate the issue and provide responses. If ALDF refused to divert resources to combat the Forest Service's decision, it would suffer a loss of credibility, support, and organizational goodwill among its donors, its peers, and the legal community. Therefore, the Forest Service's decision both impairs and frustrates ALDF's ability to carry out its mission, and is causing a drain on ALDF's resources for advocacy that could otherwise be used on many of ALDF's other extremely pressing animal protection projects.

14.     These injuries are directly caused by the Forest Service's decision to allow the sale of Devil's Garden wild horses "without limitation," and will be redressed if the Plaintiffs prevail in this action because it will mean that the Forest Service will not be allowed to sell any of these horses for slaughter.

15.     Plaintiff CARLA BOWERS is a resident of Volcano, California and for many years has advocated for the preservation and protection of the wild horses that live in the Devil's Garden WHT. She has regularly visited the Devil's Garden WHT since the spring of 2012, and very much enjoys observing, photographing, and studying the wild horses who live there and their habitat. Ms. Bowers derives immense recreational and aesthetic enjoyment from observing these wild horses and the public lands on which they live, and she has definitely bonded with these horses in a very personal way. She has also used her research to present relevant data concerning these horses and their habitat to the Forest Service. In fact, because of her unique knowledge and interest in these particular horses, the Forest Service invited her to be a member of a "Wild Horse Placement Group" established to determine the appropriate disposition of wild horses removed from the Devil's Garden WHT. While Ms. Bowers opposes the removal of any of these horses from the public lands, she has an intense interest in ensuring that any horses that *are* removed from the WHT are placed in the most humane environment possible, and that no horses removed from the WHT are ever sold for slaughter or any other inappropriate purpose.

16.     Ms. Bowers' personal, aesthetic, and recreational interests in the Devil's Garden wild horses and the public lands on which they live are severely impaired by the Forest

Service's recent decision to now allow the sale of some of these horses "without limitation"—meaning that they may be sold for slaughter. Knowing that some of these horses will meet such a horrific fate is causing her extreme emotional anguish and ruining her ability to continue to enjoy visiting the Devil's Garden WHT—she simply cannot go back to these public lands to observe the wild horses and their habitat knowing that many of these horses will soon be sold for slaughter. The Forest Service's decision also undercuts and dilutes Ms. Bowers' influence with that agency regarding the current and future placement of wild horses removed from the public range. In particular, should the Forest Service begin selling horses without limitation to buyers who will slaughter the horses, the agency will be far less motivated to collaborate with Ms. Bowers and other advocates to ensure humane placement of excess horses after their removal from the range. All of these injuries are directly caused by the Forest Service's decision and will be ameliorated if Plaintiffs prevail in this action, because this will mean that none of these horses may be sold for slaughter.

**DEFENDANTS**

17.     Defendant VICKI CHRISTIANSEN is Chief of the Forest Service and is sued in that capacity. She is charged with ensuring the Forest Service's compliance with its environmental obligations, and she has ultimate responsibility for the decision to sell federally-protected wild horses "without limitation," including to buyers who will slaughter the horses for human consumption.

18.     Defendant GEORGE "SONNY" PERDUE is Secretary of the U.S. Department of Agriculture ("USDA"), and is sued in that capacity. Because the Forest Service is an agency within USDA, Defendant Perdue has ultimate responsibility for the decisions of the Forest Service, including its recent decision to sell federally-protected wild horses "without limitation" including to buyers who will slaughter horses for human consumption.

19.     Defendant RANDY MOORE is Regional Forester for the Pacific Southwest Region, and is sued in that capacity. He is charged with overseeing all decisions issued by national forest officials in the Pacific Southwest Region of the Forest Service, including in the Modoc National Forest. Accordingly, he has ultimate responsibility for the recent decision of

1    the Modoc National Forest to sell federally-protected wild horses "without limitation"

2    including to buyers who will slaughter horses for human consumption.

3          20.    Defendant AMANDA MCADAMS is Forest Supervisor of the Modoc National

4    Forest and is sued in that capacity. She is charged with issuing all decisions on behalf of the

5    Modoc National Forest, and thus has ultimate responsibility for the recent decision by the

6    Modoc National Forest to sell federally-protected wild horses "without limitation" including to

7    buyers who will slaughter them for human consumption.

8                 **STATUTORY AND REGULATORY FRAMEWORK**

9    **A.   WILD HORSE ACT**

10          21.    Congress enacted the Wild Horse Act in 1971 out of concern that wild horses

11    were quickly "disappearing from the American scene." 16 U.S.C. § 1331. Congress declared

12    that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit

13    of the West" and that "they contribute to the diversity of life forms within the Nation and

14    enrich the lives of the American people." *Id*. As a result, by enacting the Wild Horse Act,

15    Congress sought to guarantee that "wild free-roaming horses and burros *shall be protected*

16    from capture, branding, harassment, [and] death," and "be considered in the area where

17    presently found, as an integral part of the natural system of the public lands." *Id.* (emphasis

18    added).

19          22.    The vast majority of wild horses in the United States are under BLM's

20    jurisdiction—an agency within the Department of the Interior—and are managed in "herd

21    management areas" on public lands managed by BLM. *See* 43 C.F.R. § 4710.3-1. In addition,

22    the Forest Service manages a much smaller number of wild horses in "wild horse territories"

23    ("WHT") on public lands at several national forests under its jurisdiction, as an agency within

24    USDA. *See* 36 C.F.R. § 222.60.

25          23.    Section 3 of the Wild Horse Act allows BLM or the Forest Service to manage

26    wild horses by removing "excess" animals from "a given area of the public lands," but only

27    after the agency specifically determines that: (1) "an overpopulation [of wild horses] exists on a

28    given area of the public lands," and (2) "action is necessary to remove excess animals," as

opposed to undertaking other approaches to managing wild horse populations. 16 U.S.C. § 1333(b)(2). The Wild Horse Act defines "excess" horses as those "which must be removed from any area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

24.     Once BLM or the Forest Service makes an "excess determination," it may remove from public lands only those "excess animals from the range so as to achieve appropriate management levels," which are population thresholds that the agency has previously determined will ensure a thriving natural ecological balance. 16 U.S.C. § 1333(b)(1). Although the Wild Horse Act contemplates that BLM or the Forest Service must "determine whether appropriate management levels should be achieved by the removal or destruction of excess animals," *id.*, the Act also specifies "other options" . . . such as . . . natural controls on population levels" that might achieve a thriving natural ecological balance *Id.*

25.     In the event that BLM or the Forest Service elects to remove excess horses from the range—as opposed to undertaking other options for achieving a thriving natural ecological balance—the Wild Horse Act instructs that the agency shall, "in the following order and priority," (1) "order old, sick, or lame animals to be destroyed in the most humane manner possible"; (2) ensure "private maintenance and care [of horses] for which [the agency] determines an adoption demand exists by qualified individuals, and for which [the agency] determines [it] can assure humane treatment and care (including proper transportation, feeding, and handling)"; and (3) "cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible." 16 U.S.C. § 1333(b)(2); *see also* 36 C.F.R. § 222.69(c).

**C. NATIONAL FOREST MANAGEMENT ACT**

26.     NFMA requires the Forest Service to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). In developing and amending land and resource management plans ("Forest Plans"), the Forest Service "shall use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." *Id.* § 1604(b). Congress

1  mandated that the Forest Service "shall provide for public participation in the development,
2  review, and revision of land management plans." *Id.* § 1604(d).

3      27.    NFMA's implementing regulations provide that "[t]he first priority for planning
4  to guide management of the National Forest System is to maintain or restore ecological
5  sustainability of national forests and grasslands to provide for a wide variety of uses, values,
6  products, and services." 36 C.F.R. § 219.2(a). Subsequent site-specific decisions to implement a
7  Forest Plan "must be consistent with the applicable plan," and, if not, "the responsible official
8  may modify the proposed decision to make it consistent with the plan, reject the proposal, or
9  
10 amend the plan to authorize the action." *Id.* § 219.10. The Forest Service's Range Management
11 Manual provides that "Wild Horse and Burro Territory plans are to conform with the Forest land
12 and resource management plans," *id.* § 2263.11; territory plans must be in "compliance with the
13 management direction identified in Regional Guides and Forest land and resource management
14 plans," *id.* §2263.1; and a territory plan must "describe[] desired population level, detailed
15 management practices, interagency coordination, scheduling, and monitoring requirements for
16 managing each herd unit, within the direction established in the Forest plan," *id.* § 2260.5.
17 

18  **D.    NATIONAL ENVIRONMENTAL POLICY ACT**

19      28.    NEPA requires all federal agencies to prepare a "detailed statement"—i.e., an
20 EIS—regarding all "major federal actions significantly affecting the quality of the human
21 environment." 42 U.S.C. § 4332.

22      29.    Agencies must take a "hard look" at all of the consequences, environmental
23 impacts, and adverse effects of their proposed actions. *See Kleppe v. Sierra Club*, 427 U.S. 390,
24 410 n.21 (1976).

25      30.    Under NEPA, an EIS must describe (1) the "environmental impact of the
26 proposed action," (2) any "adverse environmental effects which cannot be avoided should the
27 proposal be implemented," (3) alternatives to the proposed action, (4) "the relationship between
28 local short-term uses of man's environment and the maintenance and enhancement of long-

-9-

term productivity," and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C).

31.    Regulations promulgated by the Council on Environmental Quality ("CEQ") guide an agency's determination of whether the impacts of an action are "significant" and thus require preparation of an EIS. 40 C.F.R. § 1508.27. An agency must consider, among other factors, "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id.* § 1508.27(b).

32.    Federal agencies "shall to the fullest extent possible . . . encourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2. "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* "Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." *Id.*

**FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF**

**A.   THE DEVIL'S GARDEN WHT AND THE 1991 FOREST PLAN**

33.    The Devil's Garden WHT is located north of the town of Alturas, California in Modoc County. The Devil's Garden WHT, which lies primarily within the Modoc National Forest, consists of approximately 258,000 acres of public land. It is the last large wild horse territory on Forest Service land in California. While a small portion of the WHT—8,300 acres—falls on lands under the jurisdiction of BLM, the Forest Service takes the lead role in managing the entire territory pursuant to an inter-agency Memorandum of Understanding since the vast majority of the WHT's acreage is on Forest Service land.

34.    In late 1980s and early 1990s, the Forest Service went through the formal Land and Resource Management Plan development process for the Modoc National Forest pursuant to NFMA. At the conclusion of that process, the Forest Service issued the 1991 Forest Plan for the

Modoc National Forest, an accompanying EIS, and a Record of Decision ("ROD"). None of those documents references—let alone analyzes—selling wild horses "without limitation" for commercial purposes such as slaughter for human consumption.

35.     The Forest Service has not issued a revised Forest Plan. Thus, the 1991 Forest Plan remains the legally operative programmatic planning document for the Modoc National Forest, including on wild horse management matters related to the Devil's Garden WHT.

**B.     THE GOVERNMENT'S ADOPTION AND SALE POLICY AND PRACTICE**

36.     In the mid-1990s, the Fund for Animals sued BLM due to concerns that wild horses were being adopted or purchased by individuals who then sold the horses to commercial slaughterhouses. In 1997, BLM entered into a court-approved settlement agreement to resolve that lawsuit, in which BLM agreed to require that anyone adopting or purchasing a wild horse must swear under penalty of perjury at the time of adoption or purchase that they did not intend to kill or sell the horses for commercial slaughter, nor would they transfer ownership to anyone who they knew or had reason to believe would kill the horses for commercial purposes.

37.     Since 1997, pursuant to this settlement agreement, BLM has included in all wild horse adoption and sale transactional forms a statement requiring an adopter or purchaser to sign, under penalty of perjury, attesting that s/he will not kill the horse for commercial purposes, nor will s/he transfer ownership to anyone who would kill the horse for commercial purposes. Specifically, BLM's adoption and sale forms require certification that "I have no intent to sell this wild horse or burro for slaughter or bucking stock, or for processing into commercial products, within the meaning of the Wild and Free Roaming Horse and Burro Act, 16 U.S.C. 1331 et seq., and regulations 43 CFR 4700.0-5(c)."

38.     Likewise, because the Forest Service looks to BLM for guidance in managing wild horses as the expert resource agency that manages the vast majority of our nation's wild horses, the Forest Service has, for several decades, required anyone adopting or purchasing a wild horse to sign a statement certifying that "I will provide humane care for such animals and will not sell or transfer ownership of any such animals that I purchase to any person or organization that intends to resell, trade, or give away such animals for processing into

commercial products." Until 2018, the Forest Service used BLM's adoption and sale forms, which included the certification language explained above.

39.     In 1998, California voters adopted Proposition 6, which codified in the California Penal Code that "it is unlawful for any person to possess, to import into or export from the state, or to sell, buy, give away, hold, or accept any horse with the intent of killing, or having another kill, that horse, if that person knows or should have known that any part of that horse will be used for human consumption." Cal. Penal Code 598c(a). This criminal prohibition on the sale or transfer of horses to be killed for human consumption applies not only to federally-protected wild horses, but more broadly to "any equine, including any horse, pony, burro, or mule." Cal. Penal Code 598c(b).

40.     After the California State Legislature enacted Cal. Penal Code 598c in 1998, BLM and Forest Service field offices in California incorporated the California state law prohibitions into their adoption and sale forms. For example, those forms expressly require a purchaser to "certify that [he/she] will not violate either section of the California Penal Code" contained in Cal. Penal Code 598c or 598d (both of which are quoted in full on the form), which must be signed by the purchaser.

41.     Because for decades BLM and the Forest Service have refused to sell horses "without limitation," any horses that could not be adopted or sold with limitation were placed in holding facilities until they could be adopted.

42.     In 2004, in response to the government's longstanding approach of only selling wild horses "with limitations," which prohibited slaughter and/or commercial processing of such horses, Senator Conrad Burns from Montana introduced the "Burns Amendment" to the Wild Horse Act through an omnibus bill. This bill amended Section 3 of the Wild Horse Act by allowing BLM and the Forest Service to sell excess horses of more than ten years of age or that have been offered unsuccessfully for adoption at least three times. *See* 16 U.S.C. § 1333(e)(1). The amendment clarified that excess wild horses meeting these criteria would be "made available for sale *without limitation*, including through auction to the highest bidder, at local sale yards or other convenient livestock selling facilities, until such time as . . . all excess

1   animals offered for sale are sold; or the appropriate management level, as determined by the

2   [agency], is attained in all areas occupied by wild free-roaming horses and burros." *Id.* §

3   1333(e)(2) (emphasis added).

4          43.     Despite the 2004 amendment to the Wild Horse Act authorizing the sale of wild

5   horses "without limitation," Congress has repeatedly rejected implementation of that effort by

6   routinely making clear in appropriations language included in the Department of Interior

7   annual appropriations that the sale of wild horses for slaughter is strictly prohibited. *See, e.g.,*

8   Consolidated Appropriations Act, 2017, Pub. L. No. 115-31 ("Appropriations herein made

9   shall not be available for the destruction of healthy, unadopted, wild horses and burros in the

10  care of [BLM] or its contractors or for the sale of wild horses and burros that results in their

11  destruction for processing into commercial products").

12         44.     Since 2004, consistent with Congress' mandate in the Interior Department's

13  annual appropriations bills, BLM has continued to adhere to its pre-2004 approach of only

14  selling horses "with limitations," thereby requiring anyone adopting or purchasing a wild horse

15  to certify at the time of adoption or purchase that they do not intend to kill or sell the horses for

16  commercial slaughter, nor would they transfer ownership to anyone who they knew or had

17  reason to believe would kill the horses for commercial purposes. Although the appropriations

18  language prohibiting sale for slaughter specifically applies to BLM, the Forest Service has

19  followed BLM's policy of ensuring that Forest Service wild horses were sold only "with

20  limitations," and requiring all buyers of wild horses to certify that no horse will be killed for

21  commercial slaughter or transferred to anyone who will slaughter them for commercial

22  purposes. In addition, for all actions taking place in California, BLM and the Forest Service

23  have continued to require purchasers to also certify that they will not violate Cal. Penal Code

24  598c and 598d.

25         45.     In 2014, BLM adopted and issued Instruction Memorandum 2014-132, which

26  "outlines policies and procedures for the Wild Horse and Burro (WH&B) Sale Program." The

27  memorandum explains that "[t]his policy was developed to provide additional assurances that

28  animals will not be processed into commercial products." This memorandum remains operative

and governs BLM's sale of excess horses, and, pursuant to contractual agreements authorizing

BLM to oversee Forest Service wild horse sales, has applied to the sale of all Forest Service

horses since 2014.

**C.      RECENT WILD HORSE ACTIONS IN THE MODOC NATIONAL FOREST**

46.     In 2013, the Forest Service issued the Devil's Garden Wild Horse Territory

Management Plan, Environmental Assessment ("EA"), Finding of No Significant Impact

("FONSI"), and ROD. Although these long-term planning documents analyzed various issues

related to wild horse management in the Devil's Garden WHT, none references—let alone

examines—the sale of excess wild horses "without limitation," the impacts of such an action,

or any feasible alternatives to that approach.

47.     In 2014, Plaintiffs AWHC and Carla Bowers brought a lawsuit challenging one

aspect of the 2013 Wild Horse Territory Management Plan and the accompanying NEPA

documents—i.e., the Forest Service's elimination of more than 23,000 acres from the middle of

the Devil's Garden WHT. In September 2017, the U.S. Court of Appeals for the District of

Columbia Circuit ruled in Plaintiffs' favor that the Forest Service's arbitrarily and capriciously

eliminated this middle section from the Devil's Garden WHT, and vacated the portions of the

Wild Horse Territory Management Plan, EA, FONSI, and ROD pertaining to the elimination of

this acreage from the Devil's Garden WHT. *See American Wild Horse Preservation Campaign*

*v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017). The remainder of the Wild Horse Territory

Management Plan and the accompanying NEPA documents remain operative.

48.     During the pendency of the D.C. Circuit litigation, the Forest Service

commissioned an internal working group to consider options for achieving the appropriate

management level in the Devil's Garden WHT. One option considered internally by this

working group was "Sales Without Limitation," which the working group concluded was *not*

"consistent with the [Wild Horse Territory Management Plan] and Forest Plan" and *would*

require "[a]dditional NEPA" review. The working group also determined that if the Forest

Service ultimately decided to pursue this option, "100% of the animals sold would likely end

up slaughtered," a "[h]uge public outcry can be expected," "Congress is likely to react by

placing a rider on the Forest Service's appropriations [similar to BLM]," the "Forest Service is likely to end up with very black eyes and unceasing scrutiny," and this approach "[m]ay be contrary to a California state law that prohibits knowingly selling a horse for slaughter."

49.    In April 2016, the Forest Service's internal working group circulated to Forest Service staff a draft implementation document for the 2013 Wild Horse Territory Management Plan. This document once again considered the option of "Sale Without Limitation (Slaughter)," but explained that this approach has "not been implementable due to enormous public controversy." The document concluded that "using [this] tool" would: "[r]equire additional environmental analysis to amend the [Wild Horse Territory Management Plan]"; "[l]ead to enormous public controversy and lengthy litigation"; and [r]isks Congressional limitations on the Forest Service's budget appropriations." The document once again concluded that this approach is *not* "consistent with the [Wild Horse Territory Management Plan] and Forest Plan" and *would* require "[a]dditional NEPA" review.

50.    In September 2016, the Forest Service conducted a wild horse roundup, which resulted in the agency removing 221 excess horses from the range. It was the first wild horse roundup in the Devil's Garden WHT in more than ten years. On information and belief, approximately 110 of those horses were adopted, 76 horses were sold "with limitations," and the remainder died or ended up in long-term holding facilities. In undertaking its 2016 wild horse roundup, the Forest Service did not issue any decision document, excess determination, or NEPA review document, and did not analyze the sale of excess wild horses "without limitation," the impacts of such action, or any feasible alternatives to this disposition approach.

51.    In July 2018, the Forest Service issued an "Updated Excess Wild Horse Determination" accompanied by a "Supplemental Information Report" pursuant to NEPA. While acknowledging that "[t]he desired placement of all horses is through adoptions and sales to avoid putting horses in long-term holding," those documents did not suggest in any way that the agency would depart from its longstanding policy and practice of selling horses "with limitations" that would prohibit killing or slaughtering horses for commercial purposes. Nor, in the absence of any suggestion that such sales would be "without limitation," did the Forest

Service examine the impacts of, and alternatives to, selling wild horses to individuals who might kill them for commercial purposes, or solicit public comment on this question of immense public interest and controversy. Indeed, the Forest Service clarified that "[t]he Forest Service has generally relied on the BLM expertise . . . for operational management of individual [wild horse] herds, including: gathers, removals, transport, holding facilities, animal care, *adoption and sale events*." (Emphasis added). Again, BLM's longstanding approach— which that agency continues to follow at this time—is only selling excess wild horses "with limitations."

**D.    THE FOREST SERVICE'S DECISION TO SELL HORSES "WITHOUT LIMITATION"**

52.    Although the Forest Service has never engaged in any notice-and-comment decisionmaking concerning the possibility of selling excess wild horses "without limitation" for the first time in agency history (and in the history of the federal government), nor has it examined this highly controversial action under NEPA or alternatives to it, the Forest Service announced in a September 25, 2018 press release that it would soon begin rounding up and removing nearly 1,000 excess horses from the Devil's Garden WHT, and that those horses would be made available for adoption and sale. At the Devil's Garden Wild Horse Placement Group Conference Call that took place the same day, Forest Service officials (Ken Sandusky and Leigh Sevy) explained to the Placement Group (including Plaintiff Carla Bowers) that the agency had decided to sell excess horses with limitations (i.e., *not* for slaughter for human consumption) for the first thirty days for $25 per horse for up to 24 horses per day per buyer, and that after thirty days the Forest Service would sell older horses *without limitation* for $25 per horse for up to 36 horses per buyer per week.

53.    On October 4, 2018, a Forest Service official (Ken Sandusky) publicly clarified to the media that any horses that are not adopted or sold "with limitations" would be sold "without limitation" because, in the agency's view, "unlimited sale [is] the only fiscally responsible option." Mr. Sandusky also acknowledged that this approach is unprecedented and stated that "[b]asically everything we're doing is new."

54.     Also on October 4, 2018, Mr. Sandusky sent an email to Plaintiff Carla Bowers in which he explained that "Amanda's decision"—i.e., the decision made by Modoc National Forest Supervisor Amanda McAdams—"was to begin the 30-day adoption and sale with limitations period for 10+ year olds." He then explained that "[s]ale with limitations will be $25/horse and adoption fee will be the same as BLM." Importantly, he also explained that "[u]pon completion of that 30-day period, horses will also be *available for sale **without limitations** at $1/horse.*" (Emphasis added). His email provided no explanation for the agency's decision adopting a completely different approach to selling excess horses than the Forest Service had previously used.

55.     Upon discovering that the Forest Service was planning to take the unprecedented action of selling excess horses "without limitation," Plaintiff AWHC sent a letter to the Forest Service on October 4, 2018 urging the agency to "[p]rohibit the sale without limitation of all Devil's Garden wild horses," and explaining that the action "will result in hundreds of these horses being sold for slaughter against the wishes of 80 percent of Americans and in violation of California law that prohibits the slaughter of horses for human consumption and the export of horses for slaughter for human consumption." To date, the Forest Service has not responded to this letter.

56.     On October 9, 2018, the Forest Service began rounding up and removing horses from the Devil's Garden WHT. The agency intends to remove approximately 1,000 excess horses by early November.

57.     On October 9, 2018, Senator Dianne Feinstein of California sent a letter to the Forest Service raising concerns "that many of these animals will end up being sold to slaughterhouses." She also asked the agency to respond to the following question: "Can the Forest Service certify that no horses that are sold will be transferred to third-party buyers who may end up slaughtering the animals for commercial use?"

58.     On October 10, 2018, Pacific Southwest Regional Forester Randy Moore formally issued an op-ed in which he stated that "[h]orses that do not get adopted will be offered for limited sales." For those sales with limitations, he stated that "we will include

stipulations for buyer[s], one of which prohibits using horses for food consumption." He then explained that "[a]fter that, the only remaining path for the U.S. Forest Service to pursue [is] *unlimited sale without restrictions*." (Emphasis added).

59.     On October 12, 2018, the Forest Service "extended the timeline for wild horses to be adopted or sold with limitations." "The new timeline will be a total of 90 days from when the gather started on Oct. 10." The press release stated that "[i]t will take approximately thirty days to gather and process one thousand horses and the adoption and sale period will run for sixty days after that." Based on this press release, it is Plaintiffs' understanding that the Forest Service will not begin selling excess horses "without limitation" before January 9, 2019.

60.     On October 15, 2018, twenty-three members of the California State Legislature signed and submitted a letter to the Forest Service urging the agency "to take immediate action to halt the wild horse roundup in the Modoc National Forest" because "[t]his could very well mean that many of these horses will end up being sold to slaughter plants." They explained that "Republican and Democratic administrations have respected federal and state law's clear intent to prevent the sale of federally-protected wild horses for slaughter by ensuring that the [Forest Service] maintained a no-slaughter policy for the much smaller number of federally-protected wild horses and burros it manages." The letter concluded by requesting that the Forest Service halt the roundup until the agency can "[p]rovide credible assurances and follow up with evidence that no wild horses from the Devil's Garden Wild Horse Territory that are sold will wind up slaughtered."

E.     **SELLING HORSES WITHOUT LIMITATION WILL RESULT IN SLAUGHTER FOR HUMAN CONSUMPTION**

61.     It is well-documented that the *only* commercial use for slaughtered horses shipped out of this country is human consumption. Although no horse slaughter plants operate in the United States, some American horses are purchased at livestock auctions in the U.S. by middlemen known as "kill buyers," who transport the horses across the border and sell them to commercial slaughter facilities in Canada and Mexico. Each of these commercial slaughter facilities make products that are solely for human food products. The only commercial

slaughter market for horses that exists is for slaughter in Canada and Mexico to produce horsemeat that is sold into overseas markets for human consumption. This is why the Forest Service's own internal working group concluded that "100% of the animals sold would likely end up slaughtered" in the event that the Forest Service sells excess horses "without limitation."

62.     A recent blog post by a Modoc National Forest intern summarizing the agency's new approach to selling excess Devil's Garden horses "without limitation" explains that "sale without limitation will begin and buyers can purchase up to 36 horses for as low as a $1 apiece." The blog post further explains that "[h]orses can also be sold to sanctuaries, become ranch stock horses, packing horses, *or to buyers that may send them to slaughter*." (Emphasis added). This blog is maintained with direct financial support from the Forest Service.

## PLAINTIFFS' CLAIMS FOR RELIEF

### CLAIM ONE: VIOLATIONS OF THE APA

63.     Each and every allegation above is incorporated herein by reference.

64.     By reversing the Forest Service's longstanding policy and practice concerning the disposition of excess wild horses and by selling them "without limitation" knowing that they will be slaughtered for human consumption, the Forest Service has violated the APA by abandoning its policy and practice without supplying any legally coherent, non-arbitrary justification for its decision.

65.     By failing to conduct any notice-and-comment decisionmaking process, and instead adopting a drastically different approach to selling excess wild horses without soliciting any public input in the decision and by announcing the agency's decision through emails, press releases, and media statements, the Forest Service's decision contravenes elementary APA requirements.

66.     By jettisoning the longstanding policies and practices concerning the sale of excess wild horses by BLM—the agency from which the Forest Service admittedly seeks guidance with respect to the appropriate way to sell excess wild horses, and which in the past the Forest Service contracted with to round up, hold, adopt, and sell Forest Service excess horses—the Forest Service has acted arbitrarily, capriciously, and in contravention of the APA.

67.     By failing to consider and evaluate as part of a public decisionmaking process whether the agency's new approach of selling excess wild horses without limitation will violate Cal. Penal Code 598c—or to solicit public comment on that issue—the Forest Service acted arbitrarily, capriciously, and in violation of the APA.

68.     For all of these reasons, the Forest Service's recent decision to sell excess wild horses without limitation must be set aside as an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

69.     These unlawful actions injure Plaintiffs as described in paragraphs 7-16.

**CLAIM TWO: VIOLATIONS OF NEPA AND THE APA**

70.     Each and every allegation above is incorporated herein by reference.

71.     By failing to conduct any NEPA review whatsoever disclosing to the public that the agency was contemplating the sale of excess wild horses without limitation, and by failing to analyze in an EIS (or even an EA) the impacts of, and alternatives to, the agency's new approach of selling excess horses without limitation, the Forest Service violated NEPA, its implementing regulations, and the APA.

72.     By failing to prepare an EIS for this highly controversial, precedent-setting decision that will result in extremely significant impacts to federally-protected wild horses and that will also likely violate both NFMA and Cal. Penal Code 598c (and intensely implicate various NEPA "significance" factors"), the Forest Service violated NEPA, its implementing regulations, and the APA.

73.     By failing to ensure that "high quality" information was made "available [to] officials and citizens before decisions are made and before actions are taken," 40 C.F.R. § 1500.1(b), and by failing "to the fullest extent possible . . . [to] encourage and facilitate public involvement in decisions which affect the quality of the human environment," *id.* § 1500.2, the Forest Service acted in a manner that is arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of NEPA and the APA.

74.     For all of these reasons, the Forest Service's recent decision to sell excess wild horses without limitation violated NEPA and its implementing regulations, and must be set aside as an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

75.     These unlawful actions injure Plaintiffs as described in paragraphs 7-16.

**CLAIM THREE: VIOLATIONS OF NFMA AND THE APA**

76.     Each and every allegation above is incorporated herein by reference.

77.     By taking an action that the Forest Service's own internal working group concluded does not conform to the 1991 Forest Plan or the 2013 Wild Horse Territory Management Plan, and which was never disclosed or analyzed in either of those legally binding planning documents or their accompanying NEPA reviews, the agency's decision to sell excess wild horses without limitation violated NFMA, its implementing regulations, and the APA.

78.     By failing to formally revise or amend the 1991 Forest Plan (or the 2013 Wild Horse Territory Management Plan) pursuant to the procedures set forth in NFMA and its implementing regulations—including the solicitation of public comment on any such revisions and/or amendments—to account for this new decision that the Forest Service has never before proposed or evaluated, the agency violated NFMA, its implementing regulations, and the APA.

79.     For all of these reasons, the Forest Service's recent decision to sell excess wild horses without limitation violated NFMA and its implementing regulations, and must be set aside as an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

80.     These unlawful actions injure Plaintiffs as described in paragraphs 7-16.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that Defendants have violated the National Environmental Policy Act, the National Forest Management Act, the Administrative Procedure Act, and relevant implementing regulations;

2.    Set aside the challenged agency decision for failing to comply with federal law and the agency's own binding Forest Plan, and remand the decision for further consideration by the Forest Service;

3.    Enjoin Defendants from taking any further actions to implement the decision until the agency has fully complied with these laws;

4.    Award Plaintiffs their reasonable attorneys' fees and litigation costs in this action; and

5.    Grant Plaintiffs such other and further relief the Court may deem just and proper.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Dated: October 19, 2018                    Respectfully submitted,


                                           /s/ Christopher Berry
                                           Christopher Berry
                                           (CA Bar No. 283987)
                                           ANIMAL LEGAL DEFENSE FUND
                                           525 E. Cotati Ave.
                                           Cotati, CA 94931
                                           Telephone:    707.795.2533 ext. 1041
                                           Facsimile:     707.795.7280
                                           cberry@aldf.org

                                           /s/ William S. Eubanks II
                                           William S. Eubanks II
                                           (pro hac vice pending)
                                           D.C. Bar No. 987036
                                           MEYER GLITZENSTEIN & EUBANKS
                                           2601 S. Lemay Ave., Unit 7-240
                                           Fort Collins, CO 80525
                                           Telephone:    970.703.6060
                                           Facsimile:     202.588.5049
                                           beubanks@meyerglitz.com

                                           /s/ Katherine A. Meyer
                                           Katherine A. Meyer
                                           (pro hac vice pending)
                                           D.C. Bar No. 244301
                                           MEYER GLITZENSTEIN & EUBANKS
                                           4115 Wisconsin Ave. NW, Suite 210
                                           Washington, DC20016
                                           Telephone:    202.588.5206
                                           Facsimile:     202.588.5049
                                           kmeyer@meyerglitz.com

                                           Attorneys for Plaintiffs

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**